# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| CATHERINE STOTZKY, | ) | No. 77980-0-I |
| Respondent, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | |
| FABIENNE L. RIGGERS, | ) | UNPUBLISHED OPINION |
| Appellant. | ) ) ) | FILED: September 23, 2019 |
| | ) | |

LEACH, J. — Fabienne Riggers appeals the trial court's partition decision and award of statutory costs. Catherine Stotzky cross appeals dismissal of her breach of a fiduciary duty claim. Substantial evidence supports the trial court's challenged factual findings, which support its legal conclusions. And Stotzky failed to show any disputed material fact about her fiduciary duty claim. Because Stotzky prevailed and her requests were reasonable, the trial court did not err in awarding her costs. We affirm.

## FACTS

In 1995, Catherine Stotzky moved to Seattle after her recent divorce. She originally intended to purchase her own home near her daughter and son-in-law, Fabienne Riggers and Timothy Riggers, and their children. Stotzky searched

and found one house in her price range of $150,000. But it was far from the Riggers's home. Timothy suggested that, instead, the Riggers help Stotzky buy a house closer to their home.

After identifying a suitable house in Issaquah, the Riggers and Stotzky made a joint offer of $175,000, which the owner accepted. At closing, the owner delivered a statutory warranty deed to "Timothy P. Riggers and Fabrienne [sic] Riggers, Husband and Wife and Catherine Stotzky, a Single Person." Before closing, the Riggers and Stotzky submitted separate residential loan applications to Q Point Mortgage. Each application stated that Stotzky and the Riggers would hold title to the Issaquah property. On that same day, the Riggers and Stotzky signed additional documents "stating that the Issaquah residence would be owner-occupied."

At closing, the Riggers paid $4,188.00 in closing costs and $35,000.00 as a down payment. The Riggers and Stotzky financed the balance of the purchase price through a 30-year fixed rate mortgage loan for $140,000.00 with an interest rate of 7.75 percent. The lender reduced the interest rate by one-half percent because the property was to be owner occupied. The monthly payments of principal and interest were $1,002.98, and the monthly escrow amounts for taxes and insurance were $216.19 and $43.83, respectively.

Timothy calculated that Stotzky should make $802 monthly payments to the Riggers to cover their "carrying costs" of the property. This was the amount the $1,263 mortgage payment cost the Riggers after accounting for the economic benefit they received from tax deductions for mortgage interest and property taxes. The first payment was due November 1, 1995. Stotzky was responsible for homeowners' association dues.

Stotzky had $108,000 in funds from her divorce settlement that she had intended to invest in a house. Instead, she permitted Timothy to invest the funds for her. He was a wholesaler for Lord Abbett & Company.

Between December 1, 1995, and March 1, 1996, Stotzky wrote six checks to the Riggers.[1] On two of these checks she wrote "mortgage" on the memo line, and on four of the checks she wrote "rent." Stotzky did not remember why she made these notations. From 1996-2013, she wrote 103 checks to the Riggers. She did not write on the memo line of any of these checks. From 2004 onward, she directly deposited money into the Riggers's bank account.

From 1995-2002, the Riggers deducted the full amount of real property taxes and interest on their federal income tax returns. After 2002, Fabienne deducted these amounts on her returns. None of these returns reported Stotzky's payments as rental or other income.

---

[1] Only four were negotiated, and two were canceled after they were written.

Fabienne filed for divorce from Timothy in 2001. During the dissolution proceedings, she signed under oath and filed pleadings that described Stotzky as a co-owner of the Issaquah property.[2] Fabienne's position in the dissolution that her mother co-owned the property caused Timothy to file a declaratory judgment action against Stotzky and Fabienne. He asked the court to declare that Stotzky had no ownership interest in the Issaquah property. As part of the dissolution action settlement, Timothy dismissed the declaratory judgment action and conveyed to Fabienne his interest in the Issaquah property. In a later proceeding, where Timothy asked to reduce his spousal maintenance payments, Fabienne identified the $802 monthly payment she received from Stotzky as "payment toward [mortgage]."

Fabienne refinanced the Issaquah property mortgage in 2002 to remove Timothy as an obligor and in 2012 to get a lower interest rate. Stotzky and Fabienne signed the trust deed that secured the 2002 note. Fabienne, but not Stotzky, signed and was obligated on the note. Only Fabienne signed the 2012 mortgage note as the "borrower."

In 2013, Fabienne applied for a $50,000 home equity line of credit (HELOC), using the Issaquah house as security. Stotzky did not want the

---

[2] For example, in one declaration she stated, "Mr. Riggers insists on scheduling the deposition of my elderly mother in an effort to evict her from the house that she jointly owns with us."

property further encumbered but ultimately signed the trust deed securing the HELOC. At trial, Fabienne agreed that she was solely responsible to pay the HELOC.

In spring 2016, Fabienne told Stotzky she needed to sell the Issaquah property and invited Stotzky to move in with her. Fabienne said she planned to use the proceeds from the sale to pay off the mortgage on her Seattle home. Stotzky rejected the offer. In July 2016, Fabienne and her then ex-husband, Timothy, informed Stotzky's two other daughters that Stotzky had to move out of the Issaquah property.

In November 2016, Stotzky sued Fabienne. She asked the court to partition the Issaquah property by sale, award her the costs she paid maintaining the property, and award her damages for Fabienne's alleged breach of her fiduciary duty owed to Stotzky.

In November 2016, Stotzky moved out of the Issaquah house. Her final $802 payment to Fabienne was for November 2016. She paid the homeowners' association dues through December 31, 2016. From January to March 2017, Fabienne maintained, repaired, and prepared the Issaquah property for lease. At the end of March 2017, a real estate broker hired by Fabienne secured renters for the property. Fabienne collected rent from them from March to November, 2017.

In October 2017, the trial court dismissed, on partial summary judgment, Stotzky's breach of fiduciary duties claim. After a bench trial on the partition issues, the court partitioned the property. It concluded that Stotzky held a 52.6 percent interest in the property and awarded her statutory costs. Fabienne appeals, and Stotzky cross appeals.

## ANALYSIS

Fabienne challenges the trial court conclusion that she and Stotzky held the Issaquah property as tenants in common, claiming Stotzky was a tenant. She asserts, in the alternative, that the trial court erred in calculating Stotzky's interest in the cotenancy as 52.6 percent, in not charging her fair market rent for her exclusive use of the property, and in calculating the net rent Fabienne owed Stotzky while the house was leased in 2017. Finally, Fabienne challenges the award of statutory costs to Stotzky.

In her cross appeal, Stotzky asserts that the court should not have dismissed her breach of fiduciary duty claim on summary judgment.

We affirm on all issues.

Substantial Evidence Supports the Trial Court's Findings That Stotzky and

Fabienne Were Tenants in Common

Fabienne contends that the evidence supports only the conclusion that Stotzky occupied the Issaquah property as a tenant and her payments were rent.

She challenges the sufficiency of the evidence to support several of the trial court's findings supporting its contrary conclusion. She claims that the court relied on Stotzky's "subjective desires and beliefs" and not substantial evidence. We disagree.

Fabienne asserts that the Riggers and Stotzky made an oral rental agreement. This made Stotzky a tenant and her payments rent. But undisputed evidence alone sufficiently supports the trial court's contrary findings and conclusions. First, the Riggers stated on their loan application that the property would be owner occupied by Stotzky. Second, the Riggers never reported Stotzky's payments to taxing authorities as rental or other income. Third, Fabienne had Stotzky sign a trust deed as part of the first refinance of the property. Finally, Fabienne, during her dissolution and postdissolution proceedings, represented to the court under oath that Stotzky jointly owned the property.

This unchallenged evidence cuts two ways. Either there was no rental agreement or Fabienne lied on the loan application, violated federal tax law, and lied again during the dissolution and postdissolution proceedings.[3] The trial court

_____

[3] Fabienne's position here may violate 18 U.S.C. § 1014, which defines as a violation of federal law to "knowingly make any false statement or report . . . for the purpose of influencing in anyway . . . any . . . mortgage lending business . . . upon any application [or] purchase agreement." And if Fabienne failed to include required information on her tax forms and misrepresented

-7-

chose to accept as true her representations to the lender, the federal government, and the dissolution court. The trial court had discretion to do this. So substantial evidence supports the trial court's conclusion that there was no rental agreement.

Fabienne also challenges several of the trial court's specific findings of fact. These fail.

First, Fabienne challenges two findings where the court made express credibility determinations.[4] But this court does not resolve conflicting testimony or evaluate the credibility of the witnesses but instead defers to the trial court's credibility determinations.[5] So these challenges fail.

Second, Fabienne challenges two findings supported by Stotzky's testimony because, she claims, they are solely based on Stotzky's motives and desires.[6] She asserts that under the objective manifestation theory of contracts,

---

information to the dissolution court under oath, she may have violated other federal and state statutes.

[4] In finding 20, the court stated that "the testimony of the defendant and Tim Riggers concerning the existence of such an oral agreement was not credible." In finding 24, the court stated that Timothy's testimony "concerning numerous meetings with [the] plaintiff, including one attended by [Alice] Woo and [Rourke O'Brien], at which it was explained to and agreed by plaintiff that she would have no ownership interest in the property, would be only a renter, and that her name would be on title solely to qualify for a slightly lower mortgage" was not credible.

[5] Boeing Co. v. Heidy, 147 Wn.2d 78, 87, 51 P.3d 793 (2002).

[6] The two findings challenged under this legal theory are findings 25 and 58. Finding 25 states that Stotzky "would not have agreed to a rental arrangement that would last only until it was no longer financially beneficial

-8-

the "test for determining the existence of an agreement is strictly objective and any subjective motives and desires are irrelevant." Fabienne does not cite any authority that requires a trial court to ignore testimony because it is not "objective."[7] This challenge also involves a credibility determination that this court leaves to the finder of fact,[8] so it also fails.

Third, Fabienne challenges the sufficiency of the evidence to support several trial court findings to the effect that the monthly payments were not rent. This court reviews challenged findings of fact to determine whether they are supported by substantial evidence.[9] Substantial evidence supports a finding if there is a sufficient quantity of evidence in the record to persuade a fair-minded,

---

and/or possible for the Riggers to continue the arrangement." Finding 58 states that Stotzky "was absolutely devastated at the prospect of losing the home that she thought she was going to be in for the rest of her life . . . . [Stotzky's] reaction indicates to the Court that [she] was unaware of the rental arrangement described by Mr. Riggers in his testimony."

[7] Cf. State v. Logan, 102 Wn. App. 907, 911 n.1, 10 P.3d 504 (2000) ("'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'") (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

[8] Riggers cites to two cases, neither of which provide support for her theory of the requirement for "objective substantial evidence." Vikingstad v. Baggott, 46 Wn.2d 494, 497, 282 P.2d 824 (1995) (holding that a verbal agreement between two people benefitting a third person created an agreement that the third person could enforce); Wash. Irr. & Dev. Co. v. United States, 110 Wn.2d 288, 300, 751 P.2d 1178 (1988) (concluding that the trial court could disregard evidence based on its evaluation of a witness's credibility).

[9] State v. Halstien, 122 Wn.2d 109, 128, 857 P.2d 270 (1993).

rational person of the truth of the finding.[10] The party claiming error has the burden of showing that substantial evidence does not support the finding of fact.[11] If substantial evidence supports the findings, this court then decides whether the findings support the conclusions of law and judgment.[12] As stated above, this court defers to the trial court's determinations about conflicting testimony and witness credibility.[13]

Fabienne challenges a finding that Stotzky was "particularly vulnerable" after her divorce.[14] But Stotzky's testimony provides sufficient evidence to support this finding. She emigrated from France to the United States in 1960 with her then-husband. She had recently divorced from her husband of 36 years and had moved 15 times during the marriage. She had 2 years of secondary education and had never worked in the financial or real estate industry. So substantial evidence supports the finding that Stotzky was vulnerable.

Fabienne also challenges a finding that "Tim Riggers is educated, is experienced and sophisticated in financial matters, and is the type of person who would insist on putting agreements in writing unless it was to his benefit not to."

---

[10] Halstien, 122 Wn.2d at 129.
[11] Fisher Props., Inc. v. Arden-Mayfair, Inc., 115 Wn.2d 364, 369, 798 P.2d 799 (1990).
[12] Brin v. Stutzman, 89 Wn. App. 809, 824, 951 P.2d 291 (1998).
[13] Boeing Co., 147 Wn.2d at 87.
[14] Fabienne also contends that the court erred in making this finding because it was based on Stotzky's "wants and beliefs" but, as indicated above, this argument fails.

Fabienne claims that substantial evidence does not support the finding because Timothy testified that he and Fabienne did not have a written contract with Stotzky because "he trusted her." She also points to his testimony that he did not ask for a written agreement when he guaranteed his brother's loan.

But the court did not believe Timothy's testimony about an oral agreement. And Timothy testified that he was "employed at [the time the house was purchased] for 11 years by a top quality money management company called Lord Abbett & Company [and] was one of their top salespeople." He testified to applying his expertise to Stotzky's financial situation at the time, noting that he was a "creative thinker" and a "problem solver." He drafted a memo in 2016 stating that they had a rental agreement after he learned from Fabienne that she was struggling to convince her mother to let her sell the house. He testified that he wrote the memo "to hopefully avoid litigation." So substantial evidence supports the finding that Timothy is financially "sophisticated" and knew to put agreements in writing unless it was "to his benefit not to."

Fabienne also challenges a finding that

the testimony of [Stotzky], her daughters Nathalie Roloff and Melinda Baldwin, Rourke O'Brien and Alice Woo does not support the existence of such an agreement, and I find that there was no such agreement. Rather, I find that while Mr. Riggers had his own investment plan for the purchase of the Issaquah property, his plan was not agreed to by [Stotzky].

Fabienne contends that the record does not support this finding because Baldwin, Woo, and O'Brien used the term "rent" at some point. But these witnesses also made statements supporting this finding. Baldwin testified that she thought the plan was to allow her mother to live in the house "until she was incapable of taking care of herself." Roloff testified that her understanding was that the Issaquah property was Stotzky's "house, even if they [the Riggers] were putting the down payment." O'Brien testified that he told Timothy about the option to get a lower interest rate on a loan if it was owner occupied, which he would not have done if the Riggers were the sole owners. And Woo testified that her conversations with Timothy involved discussing how he might "help[ ] buy the property" and that she did not remember any conversation that made it clear to Stotzky that she was "going to pay rent." This combined testimony provides substantial evidence to support the finding that there was no rental agreement.[15]

Fabienne also challenges finding 65 that "equity requires that [Fabienne] alone bears" the expenses she incurred in maintaining and leasing the property in 2017 "since they were incurred without [Stotzky's] knowledge or consent." She contends that if this court views this statement as a finding of fact, the record

---

[15] Fabienne also asserts that Timothy's actions related to the house, particularly during the marriage dissolution, fail to support the finding. But Fabienne's sworn statements directly contradicted Timothy's position in the dissolution proceedings. She swore that the payments were mortgage payments and that her mother had an interest in the house.

does not support it because "[n]othing in the record shows that Ms. Stotzky was injured or prejudiced by [her] action in finding a tenant." But the court did not find that Stotzky was injured or prejudiced. So Fabienne bases this challenge on something the court did not find. And Fabienne and Stotzky agreed that they did not talk about the 2017 maintenance and leasing costs. So substantial evidence supports the finding.

Fabienne also challenges this finding as a conclusion of law, asserting that equity provides no basis for the court's decision. This argument, analyzed below, also fails.

Fabienne challenges one additional finding but does not provide a basis for her challenge. This finding states,

> [Fabienne's] testimony was further contradicted by previous testimony and sworn statements further described below, and from the fact that no financial application or other document introduced at trial listed [Stotzky's] $802 monthly payments to [Fabienne] as income, nor could [Fabienne] identify such a document in her testimony.

Fabienne does not identify anything in the record that describes the payments as income. And Fabienne previously stated under oath that Stotzky was a co-owner in the Issaquah property and that Stotzky's payments went toward the mortgage. So substantial evidence supports this finding.

Fabienne's challenges to the trial court's findings fail.

-13-

## The Trial Court Did Not Err in Its Partition Determinations

Next, Fabienne challenges the trial court decisions about the partition by sale. Specifically, she asserts that the court miscalculated Stotzky's interest in the property because its calculations included factors in addition to the proportion of the down payment and mortgage principal she paid. She also contends the court should have included a deduction for fair market rent for Stotzky's occupation of the property as her home and a credit to Fabienne for the net rents paid to Stotzky in 2017. We disagree.

This court reviews a trial court's partition decisions for abuse of discretion.[16] If the trial court based its ruling on "an erroneous view of the law," it abused its discretion.[17] Chapter 7.52 RCW governs a partition action between tenants in common. The trial court acts in equity when it divides property in a partition action.[18] RCW 7.52.090 directs the trial court to make partition decisions based on the "respective rights of the parties as determined by the courts." If the partition "cannot be made equal between the parties according to their respective rights, without prejudice to the rights and interests of some of

---

[16] Overlake Farms B.L.K. III, LLC v. Bellevue-Overlake Farm, LLC, 196 Wn. App. 929, 939, 386 P.3d 1118 (2016) (citing Friend v. Friend, 92 Wn. App. 799, 803, 964 P.2d 1219 (1998)).

[17] Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 339, 858 P.2d 1054 (1993).

[18] Overlake Farms, 196 Wn. App. at 947.

them," the court may require that one compensate the other based on its determination of "the inequality of partition."[19]

The statute provides no specific rules for valuing each cotenant's interest. It does not require the court, on partition, to charge fair market rent to the occupying cotenant. Nor does it instruct the court how to address rental income produced by the property. "The trial court has 'great flexibility' in fashioning equitable relief' for the parties."[20] "[A] court in the exercise of its equitable powers may fashion remedies to address the particular facts of each case, even if the partition statute does not strictly provide for such a remedy."[21]

First, Fabienne asserts that the trial court should not have considered any amounts other than "the amounts [Fabienne and Stotzky each] paid as the down payment and principal reductions on the mortgage." She correctly cites Cummings v. Anderson[22] and Iredell v. Iredell[23] as recognizing that evidence of unequal contributions to the purchase price raises a presumption that cotenants "intended to share the property proportionately to the purchase price."[24] Fabienne claims that this presumption required the court to divide the property

---

[19] RCW 7.52.440.
[20] Kelsey v. Kelsey, 179 Wn. App. 360, 365, 317 P.3d 1096 (2014).
[21] Kelsey, 179 Wn. App. at 369.
[22] 94 Wn.2d 135, 614 P.2d 1283 (1980).
[23] 49 Wn.2d 627, 305 P.2d 805 (1957).
[24] Cummings, 94 Wn.2d at 140 (citing Iredell, 49 Wn.2d at 631).

based on the down payment and principal mortgage reductions alone. It could not consider other factors, like payments of mortgage interest.

But Fabienne fails to recognize that this presumption arises from a more fundamental principle—"that a cotenant should not be permitted to take inequitable advantage of another's investment."[25] And the facts of an individual case may make application of the presumption inappropriate because "[a] partition proceeding is an equitable one in which the court has great flexibility in fashioning relief for the parties."[26] Fabienne does not cite any case applying this presumption to limit the trial court's equitable discretion in the manner she suggests. She cites no case limiting factors the court may consider to the share of the purchase price paid by each party. And she does not cite any case prohibiting the trial court from considering mortgage interest payments in reaching an equitable result.[27]

The trial court included the Iredell / Cummings presumption in its analysis. But it concluded that because

---

[25] Cummings, 94 Wn.2d at 142.

[26] Cummings, 94 Wn.2d at 143 (citing Leinweber v. Leinweber, 63 Wn.2d 54, 385 P.2d 556 (1963)).

[27] Fabienne asserts that "our Court has never considered mortgage interest payments in calculating the proportionate share of cotenants interests in property." But the absence of appellate authority on this issue does not establish that a trial court may not consider these payments to decide what is fair in a particular case.

the amounts contributed by the parties to the overall costs of ownership of the property c[ould] be calculated with reasonable accuracy, . . . apportioning the equity based on the parties' proportionate financial contributions to the total costs of ownership of the property [was] consistent with the law governing cotenancies and partition, as well as the principles of equity to be applied in such cases.

The court's determination falls within the range of fair results. And the trial court's findings support its decision. Stotzky wanted to buy a home, and she had sufficient resources to buy one. The Riggers encouraged her to let them participate in the home purchase and allow Timothy to invest her liquid assets. She expected to live in the house for the rest of her life. Fabienne provides no persuasive argument that the trial court reached an unfair result. She fails to show that the trial court abused its discretion.

Second, Fabienne asserts that the trial court should have charged Stotzky fair market rent for her occupation of the Issaquah house. But the authority she cites does not support this contention. As Fabienne accurately notes, "[t]he case law in Washington has not followed clear lines on when a cotenant in possession is liable to another co-tenant for rent." Also, "[i]t is the rule in Washington that, in the absence of an agreement to pay rent, or limiting or assigning rights of occupancy, a cotenant in possession who has not ousted or actively excluded the cotenant is not liable for rent based upon his occupancy of the premises."[28]

---

[28] Cummings, 94 Wn.2d at 145 (citing Fulton v. Fulton, 57 Wn.2d 331, 334-35, 357 P.2d 169 (1960)).

Despite this, Fabienne attributes the difference in decisions about whether rent is owed between cotenants to the "type of property involved." But she fails to recognize the outcomes in these cases sometimes depend on the nature of the relationship between cotenants, not the type of property.[29] She also claims ouster, quoting the Cummings court's statement that "[a]n appealing argument is made that, in a situation such as this, where the property is not adaptable to double occupancy, the mere occupation of the property by one cotenant may operate to exclude the other."[30] But the Cummings court ultimately concluded that the respondent's abandonment of the property eliminated this argument.[31] And, here, Fabienne never attempted to occupy the house, so her ouster argument is meritless.

Finally, Fabienne contends that the court miscalculated Stotzky's share of the 2017 rental income. She asserts that neither the record nor the law supports the court's decision not to reduce Stotzky's share of the rental income by the amount Fabienne paid to maintain the property.

First, she challenges a finding of fact stating that the court found that equity required that Fabienne bear the expenses she incurred to maintain and

---

[29] For example, some decisions have based an ouster conclusion about a single-family home on pending divorce proceedings where the nature of the relationship between the two parties precludes co-occupancy. See Cummings, 94 Wn.2d at 145.
[30] Cummings, 94 Wn.2d at 145.
[31] Cummings, 94 Wn.2d at 145.

lease the property in 2017 "since they were incurred without [Stotzky's] knowledge or consent." As discussed above, substantial evidence supports this finding.

Fabienne next identifies the rule in Washington as "a co-owner is responsible for his share of the necessary property maintenance expenses throughout his tenure of ownership."[32] In addition, she describes the rule as "where a cotenant leases property without the participation of another cotenant, the recognized remedy has been to require the cotenant to render an accounting and pay over a proportionate share of the profits." But Stotzky vacated the premises before Fabienne incurred her claimed maintenance expenses. As we have noted, courts have broad discretion to identify the fair distribution of property interest in a partition.[33] Fabienne fails to establish that the trial court abused its discretion.

We conclude that the trial court did not abuse its discretion in its partition decisions.

### The Trial Court Properly Awarded Costs

Fabienne claims that the trial court should not have awarded Stotzky statutory costs because Stotzky was not the prevailing party. And even if she were the prevailing party, the court should not have awarded costs for service of

---

[32] Yakavonis v. Tilton, 93 Wn. App. 304, 313, 968 P.2d 908 (1998).
[33] Kelsey, 179 Wn. App. at 369.

process, subpoenas served on several witnesses, and transcription of an exhibit. We again disagree.

RCW 4.84.030 states that in "any action in the superior court of Washington the prevailing party shall be entitled to his or her costs."[34] Whether a party is a "prevailing party" is a mixed question of law and fact that the court reviews under an error of law standard.[35] The trial court has discretion when it awards costs to the prevailing party.[36]

The prevailing party means the party in whose favor final judgment is rendered at the end of the entire case.[37] Here, the trial court entered final judgment granting partition. Stotzky filed for partition. Fabienne denied that Stotzky had any interest in the property and Fabienne should be declared the sole owner. Because the trial court decided to partition the property and awarded Stotzky the larger interest in the property, Stotzky was the prevailing party despite the dismissal of her claim for breach of fiduciary duty on summary judgment.

---

[34] Fabienne claims that the statute does not include a court sitting in equity but fails to provide authority to support that claim. Logan, 102 Wn. App. at 911 n.1.

[35] Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn. App. 697, 706, 9 P.3d 898 (2000).

[36] Austin v. U.S. Bank of Wash., 73 Wn. App. 293, 310, 869 P.2d 404 (1994).

[37] Marassi v. Lau, 71 Wn. App. 912, 915, 859 P.2d 605 (1993) (abrogated on other grounds by Wachovia SBA Lending, Inc. v. Kraft, 165 Wn.2d 481, 915, 200 P.3d 683 (2009)).

Fabienne also asserts that the trial court abused its discretion by awarding Stotzky costs for service of process and subpoenas. RCW 4.84.010 provides that costs may be awarded for

> (1) Filing fees;
> (2) Fees for the service of process by a public officer, registered process server, or other means, as follows:
> (a) When service is by a public officer, the recoverable cost is the fee authorized by law at the time of service;
> (b) If service is by a process server registered pursuant to chapter 18.180 RCW or a person exempt from registration, the recoverable cost is the amount actually charged and incurred in effecting service;
> . . . .
> (5) Reasonable expenses, exclusive of attorneys' fees, incurred in obtaining reports and records, which are admitted into evidence at trial . . . , including but not limited to medical records, tax records, personnel records, insurance reports, employment and wage records, police reports, school records, bank records, and legal files[.]

Specifically, Fabienne challenges the awards for service of process fees and witness fees for subpoenas duces tecum served on Timothy, The Escrow Service, Chicago Title Insurance Co., Eagle Mortgage, and B[oeing] E[mployees] C[redit] U[nion]. She asserts that the court erred because the "subpoenas were for records depositions undertaken as a part of pretrial discovery." But Stotzky used these subpoenas to obtain material evidence later admitted at trial. So the trial court had discretion under RCW 4.84.010 to award these costs.[38]

---

[38] CR 54(d)(1), (2; Lee v. Sauvage, 38 Wn. App. 699, 710, 689 P.2d 404 (1984).

Fabienne also challenges the costs awarded Stotzky for service of process and a subpoena duces tecum on Rourke O'Brien because he filed objections to the subpoena. But O'Brien objected only to producing records required by the subpoena. As compelled by the subpoena, O'Brien appeared and testified as a witness for Stotzky's case in chief. So the trial court did not abuse its discretion by awarding Stotzky costs to obtain O'Brien's testimony.

Finally, Fabienne contends that the trial court should not have awarded the cost for a full transcript when the court admitted only five pages at trial. She contends that because the court did not admit the entire transcript, the court should not have awarded the entire transcription cost. Also, she contends the cost was not reasonable for the transcript and so not permitted under RCW 4.84.010(5).

Exhibit 25 is five pages of Fabienne's testimony during a hearing on Timothy's 2003 spousal maintenance motion. This evidence was material to the case because it helped prove Fabienne's earlier inconsistent position about Stotzky's interest in the property. The court relied upon this evidence and quoted from it in its findings.

Stotzky had difficulty obtaining this evidence because it was not transcribed before she filed this lawsuit and the original stenographer was unavailable to transcribe her notes. She left them with the court clerk when she

left.   Stotzky asked the court stenographer referred to her by the Court Operations Supervisor to transcribe the notes for the section she wished to introduce into evidence.   Because he was transcribing another stenographer's notes, the time involved and the extent of the hearing transcribed resulted in a larger bill than the five pages would have cost had the original stenographer been available.   So, as the trial court noted, the transcription occurred under "unusual circumstances."   Given the transcription's materiality, the costs associated with these "unusual circumstances" were reasonable.

We conclude that the trial court did not err in awarding Stotzky costs.

### The Trial Court Did Not Err in Dismissing Stotzky's Fiduciary Duty Claim

In her cross appeal, Stotzky challenges the trial court's dismissal of her breach of fiduciary duty claim for encumbering the house with the $50,000 HELOC on partial summary judgment.   This court reviews an order on summary judgment de novo.[39]   It considers all facts and reasonable inferences in the light most favorable to the nonmoving party.[40]   It awards summary judgment only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[41]

---

[39] CR 56(c); Sabey v. Howard Johnson & Co., 101 Wn. App. 575, 581-82, 5 P.3d 730 (2000).

[40] CR 56(c); Sabey, 101 Wn. App. at 581-82

[41] CR 56(c); Sabey, 101 Wn. App. at 581-82.

Stotzky first contends that Fabienne, as a cotenant, owed her a duty not to encumber the house, citing Woodard v. Carpenter.[42] But we find Woodard distinguishable. It involved a cotenant who, unbeknownst to the other, failed to pay taxes and assessments, purchased the property on foreclosure, and, due to the delinquent assessments, was estopped from claiming the land awarded in the foreclosure.[43] So the encumbrance was made without the knowledge of the cotenant, and the remedy was estoppel in order to ensure that Woodard did not "take advantage of his or her own wrong or neglect and profit thereby."[44] Here, Stotzky cosigned the loan, so she knew of the encumbrance. And Fabienne agreed to full liability for the loan, so there was no taking advantage to prevent.

Stotzky also asserts that Fabienne owed her the duty not to interfere with her coequal rights as a party to a joint venture. She cites Douglas v. Jepson,[45] which provides that cotenants generally have no duty to disclose an encumbrance to their own interest in a cotenancy unless that cotenancy is also a partnership. Stotzky asserts that the question of whether she and Fabienne were in a partnership was an issue of material fact that prevented the trial court from granting summary judgment. But even if a partnership existed, Fabienne did not

---

[42] 31 Wn.2d 271, 273, 195 P.2d 983 (1948).
[43] Woodard, 31 Wn.2d at 273-74, 275.
[44] Woodard, 31 Wn.2d at 273-74, 275.
[45] 88 Wn. App. 342, 348-350, 945 P.2d 244 (1997).

-24-

breach a duty to disclose because Stotzky was present when Fabienne obtained the HELOC.

Finally, Stotzky contends that she and Fabienne shared a "confidential relationship" that gave rise to unique fiduciary duties. She relies on <u>McCutcheon v. Brownfield</u>,[46] which states that "'[a] confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation is particularly likely to exist where there is a family relationship.'" As Fabienne notes, in <u>McCutcheon</u> and the two additional cases Stotzky cites, the courts evaluated whether or not a child improperly influenced a parent to sign a deed.[47] In each case, the court analyzed the possible existence of a confidential relationship because that would shift the burden of proof for showing undue influence.[48] Stotzky does not cite any cases where the court considered whether, like here, a confidential relationship could provide the basis for a breach of fiduciary duty if the claimant does not assert being the victim of undue influence.[49]

---

[46] 2 Wn. App. 348, 357, 467 P.2d 868 (1970) (quoting RESTATEMENT OF RESTITUTION § 166 cmt. d (AM. LAW INST. 1937)).

[47] <u>McCutcheon</u>, 2 Wn. App. at 356; <u>Pedersen v. Bibioff</u>, 64 Wn. App. 710, 718, 828 P.2d 1113 (1992); <u>Lewis v. Estate of Lewis</u>, 45 Wn. App. 387, 388-89, 725 P.2d 644 (1986).

[48] <u>McCutcheon</u>, 2 Wn. App. at 356; <u>Pedersen</u>, 64 Wn. App. at 718; <u>Lewis</u>, 45 Wn. App. at 388-89.

[49] Stotzky appears to contend that she acquiesced to the HELOC under duress. For example, she claims that Fabienne "told . . . Stotzky that if she did not sign the documents [to facilitate the HELOC], she would make . . . Stotzky go

Stotzky fails to show a legal basis for her claim that Fabienne violated a fiduciary duty to her.

Stotzky also asserts that emotional distress damages are available for breach of fiduciary duty. Because she does not establish that she has this claim, we need not evaluate it.

We conclude that the trial court did not err in dismissing Stotzky's claim in summary judgment.

## CONCLUSION

We affirm. Substantial evidence supports the trial court's challenged findings. The trial court did not abuse its discretion in its partition decision or in awarding Stotzky costs. And Stotzky does not establish the court erred in dismissing her claim for breach of fiduciary duty on summary judgment.

_Leach, J._

WE CONCUR:

_____        _____

---

live in an apartment." But she does not assert duress or undue influence, so this argument does not help her.